1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   PHILLIP L. PEREZ,                           1:10-cv-00612-LJO-DLB (HC)

10                    Petitioner,              FINDINGS AND RECOMMENDATION
                                               REGARDING PETITION FOR WRIT OF
11         v.                                  HABEAS CORPUS

12                                             [Doc. 1]
     KEN CLARK,
13
                     Respondent.
14   _____/

15

16         Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

17   pursuant to 28 U.S.C. § 2254.

18                                   DISCUSSION[1]

19         Petitioner is currently in the custody of the California Department of Corrections and

20   Rehabilitation (CDCR) following his 2002 conviction of kidnap for ransom and attempted

     extortion.  Petitioner is serving a term of seven-years-to-life, plus two years.

21
           In the instant petition, Petitioner does not challenge the validity of his conviction; rather,
22
     he challenges a September 8, 2008 decision by the California Board of Parole Hearings (Board)
23
     denying him parole.
24
           In December 2008, Petitioner filed a petition for writ of habeas corpus in the Los Angeles
25
     County Superior Court challenging the Board's 2008 decision as not being supported by some
26
     evidence of his current dangerousness.  (Ex. 1, to Pet.)  The superior court found there was some
27

28   _____
           [1] This information is taken from the state court documents attached to Respondent's answer.

1  evidence to support the Board's 2008 finding that Petitioner remained a danger to society and

2  denied the habeas petition.

3     Petitioner then presented the same claim in a habeas petition to the California Court of

4  Appeal.  The petition was denied after finding the circumstances of Petitioner's commitment

5  offense, lack of insight into the crime, and limited institutional programming, constituted some

6  evidence to support the Board's finding of unsuitability.

7     Petitioner raised the same claim to the California Supreme Court, which summarily

8  denied the petition.

9     Petitioner filed the instant petition for writ of habeas corpus on April 8, 2010.

10  Respondent filed an answer to the petition on June 14, 2010, and Petitioner filed a traverse on

11  July 7, 2010.

12                STATEMENT OF FACTS[2]

13     Just before New Year's Day in 2000, Steven Barnes, called an escort service from his

14  room at the Bellagio Hotel in Las Vegas, Nevada.  The escort service sent Clark to Barnes' room.

15  Barnes agreed to and did pay her $300 for sex.  The next night Barnes gave Clark the key to his

16  room and $3,000 for the sex they had and were planning to have.  Barnes took Clark to dinner at

17  the hotel and sometimes gambled with her.  One day while his room safe was open he gave Clark

18  $2,000 or $3,000.  Barnes told Clark that he had approximately $20,000 in the safe.  During his

19  entire stay in Las Vegas, he had sex with Clark once or twice a day and he paid her

20  approximately $6,000 in cash.  On January 2, 2001, Barnes woke up in his hotel room and saw

21  Clark looking through his briefcase.  His briefcase contained personal belongs such as his wallet,

22  credits, checkbook and business accounts.  When Clark explained that she needed money to pay

23  her rent, Barnes wrote a check to a rental management company on her behalf in the amount of

24  $1,350.  His home address and telephone number were on the check.  On January 3, 2001, before

25  leaving Las Vegas, Barnes gave Clark another personal check for $7,000.  He also gave her his

26  business card with one of his business phone numbers on it.  Clark agreed to fly to Los Angeles

27

28     [2] The relevant statement of facts related to Petitioner is taken from the 2008 Board hearing which quoted from the California Court of Appeals decision on direct review.

the following weekend to visit him.  He also gave Clark his home telephone number.  When Barnes arrived home in Santa Monica, he telephoned the bank to stop payment on both checks.  He did not tell Clark that he had done so.

On January 4, 2001, Clark presented the $7,000 check to the bank.  After confirming with Barnes that a stop payment had been placed on the check, the teller informed Clark the check could not be cashed.  Clark left the bank and telephoned Barnes about the refusal of the check, and Barnes told her he had stopped payment on both checks.  Clark was very unhappy and told him that he needed to pay, and if he did not he would hear from her lawyer.  Barnes warned Clark to leave him alone or he would get the Los Angeles Police Department involved.

Later that after afternoon, Munns went with Clark back to the bank and attempted to cash the check again.  When the teller responded that she could not cash it, Munns became irate.  The supervisor told Munns to take the matter up with Barnes, and Munns stated "I'll handle it" or "I will take care of this."  The supervisor later telephoned Barnes about her concern for his safety.

On January 11, 2001, between 10:30 and 11:00 p.m. Barnes picked up Roxanne Shimp at the house of a relative she was visiting.  She agreed to have sex with Barnes for $500.  He had meet Shimp, a prostitute, on an earlier occasion in Las Vegas.  After arriving at his Bellaire home, he escorted Shimp to the front door.  As he opened it, three men charged him.  Munns was in the front, Petitioner was behind, and the third male could not be identified.  Barnes was ordered to the floor, and then he was hit with a club device and knocked to the floor.  He was then struck in the back and kicked on the side of his face.  Shimp was hysterical and curled up on the floor.  Petitioner took Barnes' Rolex watch, valued at $12,000, from him.  The men bound his arms and legs with duct tape and informed Barnes they were there in response to the check he wrote Clark.

The men then demanded $20,000 and asked about his safe.  One of the men threatened to kill Barnes if he did not cooperate.  Barnes denied having a safe or money on his person.  A knife was held to Barnes' head and ear, and one of the men threatened to cut of his ear and blow off his head if he did not give them money.  They took $200 or $300 from Barnes' pants pocket.  Barnes told them that his father had $20,000 at his residence and he would take them there.  Before

3

1   leaving, the men took various items from the residence, including a television, leather jackets,

2   Laker season tickets and cowboy boots.  Barnes valued these items at $50,000.

3       The three men, Barnes, and Shimp all left the residence in two different vehicles.  Barnes

4   was in the back seat behind an unidentified driver and Petitioner was in the front passenger seat.

5   Munns drove Barnes' truck with Shimp as the passenger.  When they got to the father's

6   residence, Petitioner told Barnes to tell his father to open to the door because they needed to talk.

7   His father opened the front door and turned on the porch and yard lights.  Munns and Perez who

8   were approaching the house returned to the car.  After reporting Barnes' father was calling the

9   police, Munns and Perez removed Barnes and got into the car.  Shimp exited the truck, and got

10   into the back seat of the car with Munns and Petitioner.

11       On January 17, 2001, Petitioner called Barnes at his business and said, "This is your

12   house gift.  You need to take care of this.  You need to get us the $20,000 and we're going to

13   [sic] – you just need to take care of this, or we're coming back to your house, and somebody is

14   going to get hurt."

15       On January 19, 2001, Petitioner called Barnes again and told him to call a certain

16   telephone number at 9:00 p.m.  After Barnes called the number, Petitioner told him to place the

17   $20,000 in a paper bag and throw it in the gutter in front of John and Pete's Liquor Store on La

18   Cienega Boulevard.  Two police officers hid in the back seat of the car Barnes drove to the drop-

19   off location.  At the location, Barnes threw a red duffle bag containing phony money out of his

20   car window as he drove by.  Perez then came out of some bushes and appeared to be making a

21   telephone call at a pay phone while keeping an eye on the bag.  He then ran across the street

22   picked up the bag and ran off.  After he was arrested, Petitioner claimed he was just "picking up

23   money that's owed to me.  He owes us a lot of money."

24       At trial, Petitioner presented an alibi defense for the January 11th robbery and kidnapping

25   incident and presented evidence to establish his character traits for honesty and nonviolence and

26   Barnes' character for dishonest.  Petitioner also denied asking anyone to collect money that

27   Barnes owed Clark.

28

DISCUSSION

There is no independent right to parole under the United States Constitution; rather, the right exists and is created by the substantive state law which defines the parole scheme.  Hayward v. Marshall, 603 F.3d 546, 559, 561 (9th Cir. 2010) (en banc) (citing Bd. of Pardons v. Allen, 482 U.S. 369, 371 (1987); Pearson v. Muntz, 606 F.3d 606, 609 (9th Cir. 2010) (citing Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005)); Cooke v. Solis, 606 F.3d 1206, 1213 (9th Cir. 2010).  "[D]espite the necessarily subjective and predictive nature of the parole-release decision, state statutes may create liberty interests in parole release that are entitled to protection under the Due Process Clause."  Bd. of Pardons v. Allen, 482 U.S. at 371.

In California, the Board of Parole Hearings' determination of whether an inmate is suitable for parole is controlled by the following regulations:

(a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for a denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

Cal. Code Regs. tit. 15, §§ 2402(a) and (b).  Section 2402(c) sets forth circumstances tending to demonstrate unsuitability for release. "Circumstances tending to indicate unsuitability include:

(1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.
(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

5

(C) The victim was abused, defiled or mutilated during or after the offense.
(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

Cal. Code Regs. tit. 15, § 2402(c)(1)(A)-(E),(2)-(9).

Section 2402(d) sets forth the circumstances tending to show suitability which include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

1 | Cal. Code Regs. tit. 15, § 2402(d)(1)-(9)

2 |      The California parole scheme entitles the prisoner to a parole hearing and various

3 | procedural guarantees and rights before, at, and after the hearing.  Cal. Penal Code § 3041.5.  If

4 | denied parole, the prisoner is entitled to subsequent hearings at intervals set by statute.  Id.  In

5 | addition, if the Board or Governor find the prisoner unsuitable for release, the prisoner is entitled

6 | to a written explanation. Cal. Penal Code §§ 3041.2, 3041.5.  The denial of parole must also be

7 | supported by "some evidence," but review of the Board's or Governor's decision is extremely

8 | deferential.  In re Rosenkrantz, 29 Cal.4th 616, 128 Cal.Rptr.3d 104, 59 P.3d 174, 210 (2002).

9 |      Because California's statutory parole scheme guarantees that prisoners will not be denied

10 | parole absent some evidence of present dangerousness, the Ninth Circuit Court of Appeals

11 | recently held California law creates a liberty interest in parole that may be enforced under the

12 | Due Process Clause.  Hayward v. Marshall, 602 F.3d at 561-563; Pearson v. Muntz, 606 F.3d at

13 | 609.  Therefore, under 28 U.S.C. § 2254, this Court's ultimate determination is whether the state

14 | court's application of the some evidence rule was unreasonable or was based on an unreasonable

15 | determination of the facts in light of the evidence.  Hayward v. Marshall. 603 F.3d at 563;

16 | Pearson v. Muntz, 606 F.3d at 608.

17 |      The applicable California standard "is whether some evidence supports the *decision* of

18 | the Board or the Governor that the inmate constitutes a current threat to public safety, and not

19 | merely whether some evidence confirms the existence of certain factual findings." In re

20 | Lawrence, 44 Cal.4th 1181, 1212 (2008) (emphasis in original and citations omitted).  As to the

21 | circumstances of the commitment offense, the Lawrence Court concluded that

22 |         although the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated

23 |         nature of the crime does not in and of itself provide some evidence of current dangerousness to the public unless the record also establishes that something in

24 |         the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's

25 |         dangerousness that derive from his or her commission of the commitment offense remain probative to the statutory determination of a continuing threat to public

26 |         safety.

27 | Id. at 1214.

28 |      In addition, "the circumstances of the commitment offense (or any of the other factors

related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to

the determination that a prison remains a danger to the public.  It is not the existence or

nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the

significant circumstance is how those factors interrelate to support a conclusion of current

dangerousness to the public." In re Lawrence, 44 Cal.4th at 1212.

"In sum, a reviewing court must consider 'whether the identified facts are *probative* to the

central issue of *current* dangerousness when considered in light of the full record before the

Board or the Governor.'" Cooke v. Solis, 606 F.3d at 1214 (emphasis in original) (citing

Hayward v. Marshall, 603 F.3d at 560).

A.    Last Reasoned Decision of California Court of Appeal

The California Court of Appeal denied the petition in the last reasoned decision stating

the following:

> The petition for writ of habeas corpus has been read and considered.
>
> The petition is denied for failure to state sufficient facts or to provide an adequate record demonstrating entitlement to relief.  There is "some evidence" to support the finding of the Board of Parole Hearings that petitioner currently poses a risk to public safety if paroled, including the circumstances of the offense, petitioner's lack of insight into the nature and genesis of his criminal conduct, and limited institutional programming.  (See *In re Lawrence* (2008) 44 Cal.4th 1181, 1190-1191; *In re Shaputis* (2008) 44 Cal.4th 1241, 1260-1261; *In re Dannenberg* (2005) 34 Cal.4th 1061, 1071.

(Ex. 4, to Answer.)

B.    2008 Board Hearing

At Petitioner's initial Board hearing in 2008, the Board found him to be an unreasonable

risk to public safety if released based on the circumstances of the commitment offense, lack of

insight into the causative factors, and insufficient programming.  As stated above, the California

Court of Appeal found "some evidence" supported the Board's decision.

The commitment offense involved multiple victims were attacked in the same or separate

incidents.  Steve Barnes was attacked and assaulted in his own home by Petitioner and two other

individuals because he cancelled checks written to a prostitute in Las Vegas.  Barnes was struck

with a club like object and fell to the floor.  He was then struck in the back of the head and

1    kicked on the side of the face.  A knife was used to cut a pocket of his pants and remove his

2    money.  Barnes legs were bound with duct tape, and the men demanded $20,000 because of the

3    cancelled checks. One of the men threatened to kill him if he did not cooperate.  When Barnes

4    denied having a safe in the house, a knife was held to his head and ear, and one of the men

5    threatened to cut off his ear and blow off his head if he did not give them money.  In response,

6    Barnes said his father had $20,000 at his residence and he would take them there.

7         The men took Barnes to his father's residence but were not successful in obtaining entry

8    to the home because the police were called.  However, six days later, on January 17, 2001,

9    Petitioner took it upon himself to telephone and threaten Barnes to give him the $20,000 or

10   someone was going to be hurt.  Petitioner telephoned Barnes again on January 19, 2001, and

11   instructed him to call a certain telephone number at 9:00 p.m.  When Barnes called the number,

12   Petitioner told him to put the money in a bag and throw it in the gutter at a certain location.

13   Barnes had apparently informed the police of the threats, and they were present during the

14   exchange, which resulted in Petitioner's arrest.

15        The Board found Petitioner lacked insight into the causative factors which lead to the

16   commitment offense, and he therefore remained an unreasonable risk to public safety.  This

17   finding was based on the fact that at the hearing Petitioner continued to express that he felt the

18   victim owed the money.  The Board felt that Petitioner presented himself as being very self-

19   absorbed and self-centered.  When asked who he harmed by the commission of the offense, he

20   mentioned Mr. Barnes briefly, and then just as quickly discussed the harm he caused to his wife,

21   family, and how it affected him personally.  Because of Petitioner's lack of explanation as to

22   what lead him to the commission of the commitment offense which took place over a period of

23   several days, the Board was still unsure as to the causative factors and how it could be avoided in

24   the future.  Such evidence was properly considered by the Board and appellate court in

25   determining whether Petitioner remains a risk to public safety.  See In re Shaputis, 44 Cal.4th at

26   1260 (commitment offense and lack of insight may provide evidence that prisoner remains

27   dangerous and unsuitable for release); see also Cal. Code Regs. tit., 15 § 2402(b).

28        In addition, the Board found that although Petitioner had participated in some

9

vocationally training, he had only done so for the previous two years, and he expressed that he had no desire to utilize his vocational training upon release.  Petitioner also participated in Alcoholics Anonymous, however, he did not practice the 12-steps and had no knowledge of them.  The Board felt he possibly completed certain programs just to appease them as he expressed no interest in the programs.

After considering the factors in support of suitability, the Board found the positive factors did not outweigh the factors of unsuitability, and the appellate court's determination that the circumstances of the commitment offense, lack of insight, and limited programming provided some evidence to support the Board's finding that Petitioner remains an unreasonable risk to public safety was not an unreasonable determination of the some evidence standard, nor an unreasonable determination of the facts in light of the evidence.  28 U.S.C. § 2254(d).

RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      The instant petition for writ of habeas corpus is DENIED; and

2.      The Clerk of Court is directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   September 21, 2010                  /s/ Dennis L. Beck
                                   UNITED STATES MAGISTRATE JUDGE